IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

\* \* \* \* \* \* \* \* \*

| | |
|---|---|
| WARREN R. OWEN, ) | |
| ) | Civil No. 2:08-cv-00356-BSJ |
| Plaintiff, ) | |
| ) | **MEMORANDUM OPINION** |
| vs. ) | **& ORDER** |
| ) | |
| MICHAEL J. ASTRUE, ) | **FILED** |
| Commissioner of Social Security, ) | CLERK, U.S. DISTRICT COURT |
| ) | March 12, 2009 (1:35pm) |
| Defendant. ) | DISTRICT OF UTAH |

\* \* \* \* \* \* \* \* \*

Plaintiff Warren R. Owen ("Owen") brought this action against Commissioner of Social Security Michael J. Astrue (the "Commissioner") pursuant to 42 U.S.C. 405(g) (2006 ed.), seeking judicial review of a decision denying Owen Social Security disability insurance benefits. Administrative Law Judge Robin L. Henrie (the "ALJ") determined Owen was not disabled under 42 U.S.C. §§ 416(i) and 423(d), and the Appeals Council denied Owen's request for review. The court heard oral argument on December 18, 2008, with Judson T. Pitts representing Owen and Carolyn D. Cooper appearing on behalf of the Commissioner. Having reviewed the ALJ's decision and the briefs supporting and opposing Owen's petition for review, as well as the record in this case, the court enters the following Memorandum Opinion & Order vacating the ALJ's decision and remanding this matter for further proceedings.

**I. BACKGROUND**

Owen was born October 25, 1968, and has a significant work history as a construction laborer. On October 26, 2004, Owen strained his back while raking asphalt at a construction site and suffered stiffness and back pain that caused him to stop working. After seeing various health

professionals but continuing to experience pain, Owen filed an application for a period of disability and disability insurance benefits on March 3, 2005, claiming he was disabled as of November 19, 2004. Owen claimed impairments of the back, spine, knee, elbow, and hands, as well as bipolar disorder and depression. The claim was initially denied October 7, 2005, and again was denied February 7, 2006. After filing a request for a hearing, Owen appeared and testified before the ALJ on September 13, 2007, in Salt Lake City. On October 25, 2007, the ALJ determined Owen was not disabled and not entitled to disability benefits. The Social Security Administration's Appeals Council denied Owen's request for review on March 7, 2008, making the ALJ's decision final.

### A. The Five-Step Sequential Evaluation Process

The ALJ denied Owen's application for benefits under the five-step sequential evaluation process used to determine whether a claimant qualifies for disability benefits. The process proceeds as described in *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005):

> At step one, the claimant must show "that he is not presently engaged in substantial gainful activity;" at step two "that he has a medically severe impairment or combination of impairments;" at step three that the impairment is equivalent to a listed impairment; and, at step four, "that the impairment or combination of impairments prevents him from performing his past work." If the claimant successfully meets his burden, the burden of proof shifts to the Commissioner at step five to show that the claimant retains sufficient residual functional capacity (RFC) to perform work in the national economy, given his age, education, and work experience.

*Id.* (citations omitted); *see also* 20 C.F.R. §§ 404.1520, 416.920 (2008).

At step one, the ALJ determined Owen had not engaged in substantial gainful activity since November 19, 2004. The ALJ listed Owen's back disorder, affective/mood disorder, and obesity as severe under the step-two analysis. At step three, the ALJ determined Owen did not

have an impairment or combination of impairments that met or medically equaled any impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1, explaining that "with respect to § 1.04, there is lacking evidence of the requisite type and severity of symptoms, including gross anatomical deformity and an inability to ambulate effectively or nerve root compromise accompanied by the requisite type and severity of symptoms." (Admin. R. at 15.)

Prior to step four, the ALJ's residual functional capacity ("RFC") assessment found, among other things, that Owen could not lift more than 8.5 pounds at a time; stand or walk more than two hours during an eight-hour workday; sit more than six hours during a workday; sit, stand, or walk more than 10 to 15 minutes at a time; stoop, bend, squat, kneel, crawl, or crouch; climb flights of stairs; or perform overhead reaching or lifting. *(Id.* at 16-17.) In accordance with this RFC assessment, the ALJ found at step four that Owen could not perform his past relevant work as a construction laborer. At step five, the ALJ determined Owen was employable in jobs that exist in significant numbers in the national economy. Based on the testimony of vocational expert Kenneth Lister, the ALJ determined Owen could perform the work requirements of such occupations as a final assembler in the optical industry, a touch-up screener, or a semiconductor bonder. (*Id*. at 34-35.)

### B. Claimant's Allegations and Medical Evidence

The ALJ summarized Owen's allegations and medical evidence of his impairments. Under the heading of "The Claimant's Allegations," the ALJ extensively discussed Owen's claims of debilitating pain. Owen testified that he injured himself in October 2004 while raking 2.5 dump loads of asphalt. According to Owen, his pain continued throughout 2004 and he did not improve in 2005 despite spinal injections, physical therapy, and pain medications including

Percocet. Owen estimated his pain level was an average six to eight on a ten-point scale during 2005. That year, he could sit and stand for about 15 minutes at a time and walk for 10 to 15 minutes. His lifting ability was curtailed to where he experienced pain lifting a gallon of milk while grocery shopping. He could perform errands for up to two hours a day, but the pain from doing so would cause him to take medication. Owen spent much time lying in bed, sometimes for up to eight hours a day in short intervals, but he was able to go camping a few times in 2005.

Owen's pain continued in 2006, as did his difficulty standing, sitting, and walking. That year he purchased candy vending machines for additional income until acquiring about 35 machines. Owen's servicing of the machines took about three to six hours a day for two days at a time. The work caused him to spend significant time in bed recovering. He took a two- or three-day camping trip in 2006, which was the longest period he was away from home.

Owen further testified that his pain in 2007 was more of the same. His walking, sitting, and standing difficulties continued, as did his use of pain medication, which left him drowsy and dizzy. When he blew out the engine of his truck, he supervised his son in replacing the engine. Owen said he was unable to do the work because he had weak hands and could not pull hard enough on the wrench to tighten bolts.

In addition to the summary of Owen's claims, the ALJ laid out a separate section considering Owen's "Medical Evidence." The ALJ reviewed evidence of Owen's impairments in the administrative record, summarizing the findings of health professionals who examined Owen or reviewed his files. Relevant for the purposes of this case are the evaluations of doctors who evaluated Owen's physical impairments and whose opinions the ALJ gave controlling weight – Drs. Heiner, Muir, Bacon, Colledge, and Gaufin – and great weight – Dr. Goldman.

Dr. David Heiner, an orthopedic surgeon, examined Owen on December 9, 2004. Owen complained that he could not sit or stand for very long and that it hurt to bend, lift, twist, turn, sit, and stand. Owen's range of motion at the lumbar spine was full, with pain at the extremes, but he was able to toe walk, heel walk, and tandem walk. From L1-S1, Owen was neurologically normal. His straight leg raises were positive on both sides. Dr. Heiner noted that Owen had definite carpal tunnel symptoms as indicated by decreased pinch grip in both hands, decreased thumb and finger sensation, a "markedly positive" Phalen's test, and a Tinel Sign of mildly irritable over the median nerve. (*Id.* at 138.) Dr. Heiner also diagnosed disc herniation at L4-5 with moderate stenosis of the central canal, and he recommended bilateral carpal tunnel release.

Dr. William S. Muir, a spinal surgeon, evaluated Owen's symptoms on January 24, 2005. Dr. Muir reported that Owen had limited range of motion with "moderate-plus" tenderness to palpation on the paraspinal muscles of the lumbar and thoracic spine. Owen's straight-leg tests were negative sitting and positive supine on the right leg, and positive on the left. His strength, reflexes, and sensation were normal. An MRI scan showed a congenitally narrowed canal at L3-4 and L4-5 with a small disc protrusion at L3-4. Although Owen's impairments made him a candidate for surgery, Dr. Muir opined that surgery would not restore Owen to his previous working condition. He suggested that Owen find employment that did not require bending, lifting, or twisting.

Dr. C. William Bacon, an orthopedic surgeon, evaluated Owen's spinal condition on February 15, 2005. Dr. Bacon reported that Owen's examination was normal, but that an MRI showed severe stenosis at L4-5 and mild degeneration at L3-4. For Owen's age, the stenosis at L4-5 was "curiously severe," and he also had polyarthralgia. (*Id.* at 156.) An epidural steroid

injection improved Owen's condition, but Owen continued to have pain, as well as paresthesia in his fingers and hands.

  Dr. Alan L. Colledge, an orthopedic surgeon, examined Owen on April 28, 2005, noting that Owen was frustrated with his prior medical treatments and felt that "someone need[ed] to compensate him for working years as a laborer." (*Id.* at 197.) Owen complained of lumbosacral pain and had reduced lumbar motion. His exam was otherwise normal. Dr. Colledge also noted disc herniation at Owen's L4-5 vertebrae and moderate stenosis of the central canal with impingement on the thecal sac. Dr. Colledge also reported that Owen had possible bilateral carpal tunnel syndrome. Dr. Colledge opined that Owen was not totally disabled and could perform some sedentary work with limited lifting. In a following consultation with Dr. Colledge on May 6, Owen was "frustrated, angry and somewhat paranoid that anyone who has worked with him, including [Dr. Colledge], is only out to limit him in getting his perceived medical care." (*Id.* at 193.) Owen had decided surgery was necessary and had refused to go to physical therapy. On May 12, 2005, Dr. Colledge noted that Owen's MRI showed "rather severe stenosis at 4-5 and a central protrusion at 3-4." (*Id.* at 209.) Owen also had desiccation with associated osteoarthritis, as well as short pedicle syndrome. Dr. Colledge's diagnoses included disc herniation at L4-5 with moderate stenosis of the central canal and impingement on the thecal sac; degenerative spinal stenosis; and complaints of carpal tunnel syndrome, which was possible bilaterally. Drs. Colledge and Bacon agreed that Owen was a surgery candidate, but that Owen would likely never be able to return to his work as a laborer. Dr. Colledge recommended that Owen have solid vocational planning before surgery and that he lose weight and gain strength.

  Dr. Lynn M. Gaufin had a neurosurgical consultation with Owen on August 15, 2005.

Owen reported difficulty walking, poor coordination, sciatic leg pain, leg weakness and numbness, and limited ability to walk and stand, among other things. Dr. Gaufin noted Owen's inability to sit normally, but found Owen's strength, cranial nerve function, coordination, station, and reflexes were normal. His sensation was normal aside from mild hypesthesia over his feet and lower legs. Owen's straight leg raises were negative. At Owen's L4-5 vertebrae, "there was a central canal stenosis, and the claimant had hypertrophy of the articular facets, a posterior bulging or protrusion of the disc, and both annulus and osteophyte formation at L4-5." (*Id.* at 219.) Dr. Gaufin's diagnosis was that Owen had high-grade, severe central canal stenosis at L4-5 and osteoarthritis at L3-4, L4-5, and L5-S1. Dr. Gaufin stated that while surgery might make Owen feel better, it was impossible to eliminate Owen's pain entirely.

    Dr. Alan J. Goldman, a neurology and psychiatry specialist, examined Owen on February 11, 2005. The exam revealed no muscle spasming, but Owen reported pain to palpation over the left lateral lumbosacral paraspinal region and over the sciatic notches. Owen experienced sensory loss over his left index finger and in his left lower extremity. Owen's strength in his four extremities was normal, and he was without ataxia or apraxia. Dr. Goldman reviewed Owen's MRI of the lumbosacral spine, noting bulges at the L3-4, L4-5, and L5-S1 invertebral spaces, with the greatest at L4-5. He noted no definitive neuronal displacement and "a question at the L4-5 intervertebral space of an abutment against the right L5 nerve root." (*Id.* at 179.) Dr. Goldman diagnosed probable musculoligamentous injury of the lumbosacral spine of the sprain/strain variety, with no evidence of radiculopathy, as well as a similar injury of the cervical and thoracic spines. He also noted possible bilateral carpal tunnel syndrome.

    Dr. Goldman reported on April 4, 2005, that Owen had "not followed through with any

of" his recommended therapeutic treatments. (*Id.* at 164.) Because of this, Dr. Goldman determined Owen reached his maximum medical improvement. He was concerned that the MRI showing of a possible abutment against Owen's L5 nerve root was on the opposite side of Owen's complaints of pain and loss of sensation. He estimated Owen's whole person permanent impairment at 5% for Owen's back and lower extremity injury.

### C. The Vocational Expert's Testimony

Kenneth Lister, a vocational expert, testified at Owen's hearing before the ALJ that, based on a state assessment, Owen could perform sedentary work if he had a sit/stand at-will option. Lister testified that Owen could not perform his previous work, but he could find employment in the national economy in such professions as a final assembler in the optical industry, a touch-up screener, and a telephone quotation clerk. The ALJ then posed a limiting hypothetical reducing Owen's physical capability to lift, stand, stay seated, bend, stoop, squat, kneel, crawl, crouch, climb stairs, and lift objects overhead. The hypothetical did not reference carpal tunnel syndrome or other manipulative impairment. Lister opined that the hypothetical would eliminate Owen's ability to perform the job of telephone quotation clerk, but he could still perform the jobs of touch-up screener, final assembler, as well as semiconductor bonder.

### D. The Parties' Arguments

On review, Owen contends that the medical record demonstrates that his injuries satisfy the requirements of a spinal disorder qualifying for disability benefits under Listing 1.04(a) of 20 C.F.R. Pt. 404, Subpt. P, App. 1. Owen argues that the ALJ failed at step three of the five-step analysis to discuss the evidence used to determine that Owen did not have an impairment or

combination of impairments that medically equaled Listing 1.04(a).[1] Additionally, Owen contends the ALJ erred in not considering or mentioning to the vocational expert any evidence of carpal tunnel syndrome in the record. Consequently, Owen asks this court to reverse the ALJ's determination and award immediate payment of benefits.

In response, the Commissioner argues that Owen did not present evidence that his impairments meet the criteria of Listing 1.04(a). Additionally, the Commissioner contends that Owen failed to demonstrate the functional consequences of his alleged carpal tunnel syndrome, and that the immediate award of disability benefits is only appropriate when it is clear that such an award is the only possible outcome.

## II. STANDARDS OF REVIEW

In reviewing the ALJ's decision, the court should "neither reweigh the evidence nor substitute [its] judgment for that of the agency." *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting *Casias v. Sec'y of Health & Human Servs.,* 933 F.2d 799, 800 (10th Cir. 1991)). Instead, the court "review[s] the ALJ's decision only 'to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied.'" *Id.* (quoting *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003)). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Doyal*, 331 F.3d at 760 (quoting *Fowler v. Bowen*, 876 F.2d 1451, 1453 (10th Cir. 1988)). A decision is not based on substantial evidence "if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it," *Bernal v.*

---

[1] Owen's petition for review and supporting briefs do not challenge the ALJ's determination that Owen's affective/mood disorder does not qualify as a listed impairment. Thus, the court will only consider the ALJ's determination under Listing 1.04.

*Bowen*, 851 F.2d 297, 299 (10th Cir. 1988), or "if it is actually mere conclusion." *Ellison v. Sullivan*, 929 F.2d 534, 536 (10th Cir. 1990). The ALJ's decision is also subject to reversal if the ALJ applied an incorrect legal standard. *Id.*

## III. DISCUSSION

### A. The ALJ's Analysis Under Listing 1.04(a)

Remand is appropriate in this case because (1) the ALJ failed to explain why Owen's impairments did not satisfy Listing 1.04(a); (2) the ALJ did not discuss what medical evidence was accepted or rejected at step three; and (3) the ALJ's analysis incorporated criteria that were not applicable under the listing.

Under the third step of the Social Security Administration's five-step disability evaluation process, an ALJ must determine whether a claimant's impairment or combination of impairments meets or medically equals the criteria of a listing set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1. To qualify for benefits, a claimant must meet all criteria of a specific listing. *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990). At step three, an ALJ must "discuss the evidence he accepted or rejected with respect to the requirements" of a listing. *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001); *see also* 42 U.S.C. § 405(b)(1) (2006 ed.). If an ALJ's findings are not supported by a weighing of the evidence in the record, a court "cannot assess whether relevant evidence adequately supports the ALJ's conclusion that appellant's impairments did not meet or equal any Listed Impairment, and whether he applied the correct legal standards to arrive at the conclusion." *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). In weighing the evidence, an ALJ "must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Id.* at 1010. Additionally, courts have found error

where an ALJ considered the wrong criteria in a listing or made general statements without discussing the medical evidence. *See Mazza v. Barnhart*, No. 06-1018-JTM, 2006 WL 4045936, *6 (D. Kan. Oct. 25, 2006); *McCluskey v. Barnhart*, No. C-00-04855 VRW, 2002 WL 500809, *3 (N.D. Cal. March 29, 2002) ("Defendant concedes that the ALJ committed legal error by applying the 12.05D criteria rather than the 12.05C criteria in the ALJ's decision denying benefits.").

Owen argues that the applicable listing for his claimed impairment is 1.04(a), which states:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, *spinal stenosis*, osteoarthritis, *degenerative disc disease*, facet arthritis, vertebral fracture), resulting in *compromise of a nerve root* (including the cauda equina) or *the spinal cord*. With:
>
> A. Evidence of *nerve root compression* characterized by *neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss* (atrophy with associated muscle weakness or muscle weakness) accompanied by *sensory or reflex loss* and, if there is involvement of the lower back, *positive straight-leg raising test* (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04(a) (emphasis added).

In *Mazza v. Barnhart*, the ALJ found the disability claimant failed to meet the criteria of Listing 1.04 based on the following analysis:

> [Plaintiff] does not have any of the conditions such as a herniated disc of such severity as to explain her symptoms. Although the claimant sometimes uses crutches and/or a knee immobilizer *she is able to ambulate*. The claimant's spinal disorders, even when considered together, do not meet any of the criteria of any part of medical listing 1.04. 2006 WL 4045936, at *6. (emphasis added).

The district court held that the ALJ had erred at step three because the ALJ had already found that the plaintiff had severe degenerative disc disease, which is a criterion of 1.04; the plaintiff

had offered evidence of nerve-root compression, which the ALJ did not discuss at step three; and the plaintiff's ability to ambulate was not one of the 1.04(a) criteria. *Id.*

As in *Mazza*, here the ALJ's step-three analysis is flawed because it does not systematically approach the criteria of the Listing 1.04 subsections, specifically 1.04(a). The ALJ stated, "Specifically, with respect to § 1.04, there is lacking evidence of the requisite type and severity of symptoms, including *gross anatomical deformity* and an *inability to ambulate effectively* or *nerve root compromise* accompanied by the requisite type and severity of symptoms." (Admin. R. at 15 (emphasis added)). Owen contends his impairments constitute a spinal disorder under 1.04(a), but "gross anatomical deformity and an inability to ambulate effectively" are not criteria under that subsection. Effective ambulation is a criterion under 1.03 and 1.04(c), but not 1.04(a). The 1.04 subsections stand independent of one another; thus the criterion of effective ambulation in 1.04(c) has no bearing on 1.04(a). 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04. Additionally, "gross anatomical deformity" is a requirement under Listing 1.02, but not 1.04(a).

Moreover, in finding Owen's impairments did not meet the criteria of Listing 1.04, the ALJ did not discuss the medical evidence supporting or contradicting that finding. The ALJ stated there was insufficient evidence of nerve-root compromise with the symptoms necessary to meet the listing. Although required to discuss the uncontroverted evidence that was not relied upon in that determination and the probative evidence that was rejected, the ALJ did neither. At step three, the ALJ did not discuss medical evidence of Owen's degenerative disc disease, stenosis of the central canal, herniation, frequent positive straight leg raises, range of motion loss, back and leg pain, impingement on the thecal sac, and nerve root abutment at the L4-5 vertebrae.

Certainly medical evidence of such symptoms and disorders is relevant to the 1.04(a) analysis and should have been included in the ALJ's step-three evaluation. Consequently, because the ALJ's analysis was mere conclusion without discussion of what evidence the ALJ accepted or rejected, the court is unable to determine whether the denial of disability benefits was based on substantial evidence.

The court may excuse as harmless error the ALJ's deficient discussion at step three if "findings at steps four and five of [the ALJ's] analysis, coupled with indisputable aspects of the medical record, conclusively preclude Claimant's qualification under the listings at step three." *Fischer-Ross v. Barnhart*, 431 F.3d 729, 735 (10th Cir. 2005). But the record in Owen's case and the ALJ's findings at steps four and five do not conclusively disqualify Owen under 1.04(a). Whereas the claimant's RFC assessment in *Fischer-Ross* precluded a disability finding, Owen's does not. *Id.* at 734 (stating that the claimant's functional assessment "clearly rejected" any notion that the claimant was disabled). For example, Owen's RFC assessment found, among other things, that Owen could not perform stooping, bending, squatting, kneeling, crawling, climbing stairs, or lifting of any significance. (Admin. R. at 17.) Thus, it would be inappropriate to apply *Fischer-Ross*'s harmless error test because it cannot definitively be said that "no reasonable factfinder could conclude" that Owen's impairments satisfy the listing criteria. *Id.*

On remand, the ALJ should properly analyze Owen's impairments under the Listing 1.04(a) criteria, discussing what uncontroverted and probative evidence in the record is accepted and rejected.

### B. The ALJ's Hypothetical to the Vocational Expert

In addition to the step-three error, the ALJ should have considered record evidence of

carpal tunnel syndrome during Owen's RFC assessment and should have mentioned uncontroverted evidence of any manipulative impairment in posing his hypothetical to the vocational expert.

A claimant's residual functional capacity is the most the claimant can do in a work setting in light of his limitations and impairments. 20 C.F.R. § 404.1545(a)(1) (2008). In an RFC assessment, an ALJ must assess a claimant's impairments, including pain and physical limitations, "based on all the relevant evidence" in the record. *Id.* §§ 404.1520(e), 404.1545(a)(1). The ALJ must consider all of the impairments of which he is aware, including those that are not severe. *Id.* § 404.1545(a)(2). One of the considerations for physical impairment is a claimant's ability to perform manipulative functions such as handling. *Id.* § 404.1545(b).

At step five of the disability analysis, an ALJ may pose hypothetical questions about the claimant's RFC to a vocational expert to determine what jobs of a significant number in the national economy may be available to the claimant. *Id.* § 404.1560. The hypothetical questions must "reflect with precision" all of a claimant's impairments "that are borne out by the evidentiary record." *Decker v. Chater*, 86 F.3d 953, 955 (10th Cir. 1996); *Shepherd v. Apfel*, 184 F.3d 1196, 1203 (10th Cir. 1999) ("The ALJ is only required to ask hypotheticals encompassing impairments that find support in the record."). Ultimately, "'[t]estimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the [ALJ's] decision.'" *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991) (quoting *Ekeland v. Bowen*, 899 F.2d 719, 722 (8th Cir. 1990)).

### 1. Medical Evidence of Carpal Tunnel Syndrome

Owen's medical records contain many references to carpal tunnel syndrome. Dr. Heiner

stated Owen had "definite carpal tunnel symptoms" and that he "would benefit from a carpal tunnel release" on both hands (Admin. R. at 137-38.) Owen's Phalen's test for carpal tunnel syndrome was "markedly positive," and his Tinel Sign was "mildly irritable over the median nerve." (*Id.* at 138.) Dr. Colledge also reported that Owen had possible bilateral carpal tunnel syndrome. Dr. Bacon noted paresthesia in Owen's fingers and hands. The ALJ accorded all three physicians' opinions controlling weight. Dr. Goldman, whose opinions the ALJ accorded great weight, noted Owen's diminished sensation in the left index finger and possible bilateral carpal tunnel syndrome. (*Id.* at 177, 179.)

### 2. The ALJ's Consideration of Carpal Tunnel Syndrome

It is clear the ALJ was aware of the evidence of carpal tunnel syndrome. In the synopsis of Owen's relevant medical history, the ALJ noted Dr. Heiner's diagnosis of carpal tunnel syndrome. (*Id*. at 22.) The ALJ's summary also mentioned Dr. Bacon's findings of decreased sensation in Owen's left index finger, as well as pain and paresthesias in his hands. (*Id*. at 23, 24.) The ALJ noted Owen's "possible bilateral carpal tunnel syndrome" in summarizing Dr. Colledge's findings. (*Id*. at 25.) Aside from the summary of Owen's medical record, the ALJ heard testimony from Owen that Owen was unable to work on automobile engines because his hands were too weak. (*Id*. at 363, 365.) The ALJ did not reject evidence of carpal tunnel syndrome, and the inclusion of the syndrome in the ALJ's discussion of the medical evidence suggests that the ALJ accepted it.

Despite mentioning evidence of carpal tunnel syndrome, the ALJ did not consider the manipulative impairment throughout the five-step evaluation process. At step two, the ALJ gave no consideration as to whether Owen's manipulative impairment was severe. Additionally, the

ALJ's RFC assessment did not mention Owen's manipulative impairment beyond his inability to reach or lift anything of significance. In the ALJ's examination of the vocational expert at Owen's hearing, the hypothetical questions posed to the vocational expert did not mention reduced manipulative function or carpal tunnel syndrome. Because "all the relevant evidence" includes evidence of carpal tunnel syndrome, 20 C.F.R. §§ 404.1520(e), and because the ALJ did not reject such evidence, the ALJ should have addressed the severity of the manipulative impairment and included reference to it in posing the hypothetical to the vocational expert.

An ALJ's flawed hypothetical to a vocational expert may be harmless error if correcting the hypothetical would not change the vocational expert's analysis. *See Gay v. Sullivan*, 986 F. 2d 1336, 1340 n.3 (10th Cir. 1993) (excusing an ALJ's error in questioning an expert if it was "minor enough not to undermine confidence in the determination of [a] case"); *Wilson v. Barnhart*, 68 Fed. Appx. 169, 172 (10th Cir. 2003) (concluding the ALJ's overstated hypothetical was harmless error because the vocational expert's recommended jobs would still be appropriate). The vocational expert in Owen's case testified that Owen could perform simple, sedentary work with sit/stand accommodations. (Admin. R. at 374-79.) After hearing the ALJ's limiting hypothetical, the vocational expert listed three jobs to illustrate Owen's work capabilities: final assembler in the optical industry, touch-up screener of electronic components, and semiconductor bonder. (*Id*. at 377-78.)

In the *Dictionary of Occupational Titles*, a final assembler of optical goods "[a]ttaches nose pads and temple pieces to optical frames, using handtools; positions parts in fixture to align screw holes. Inserts and tightens screws, using screwdriver." (DOT # 713.687-018.) The description indicates the job requires precise manipulative ability. A touch-up screener inspects

circuit boards for defects. In so doing, the screener performs minor repairs such as "trimming long leads, using wire cutter; removing excess solder from solder points (connections), using suction bulb or solder wick and soldering iron . . . ." (DOT # 726.684-110.) A screener may also "reposition and solder misaligned components." *Id.* The description indicates the job requires precise manipulative ability. A semiconductor bonder, among other tasks, "[m]ounts spool[s] of wire onto holder[s] and inserts wire end[s] through guides, using tweezers." (DOT # 726.685-066.) The description indicates that the job requires precise manipulative ability.

The vocational expert's illustrative jobs for Owen, although only examples, indicate that the expert was not considering evidence of Owen's carpal tunnel syndrome in his employment analysis. The ALJ's flawed hypothetical compromised the vocational expert's conclusions, as evidenced by his analysis that Owen is capable of performing three jobs requiring precise manipulative abilities. It follows that the ALJ's omission of manipulative limitations in the hypothetical to the vocational expert was not harmless error.

The ALJ's hypothetical to the vocational expert did not reflect with precision Owen's medical record, which included references to carpal tunnel syndrome; thus the expert's testimony cannot constitute substantial evidence for the ALJ's step-five determination. On remand, the ALJ should consider the record evidence of carpal tunnel syndrome. If the ALJ finds that the impairment is borne out by the record, reference to the manipulative limitation should be incorporated in Owen's RFC assessment and in any hypothetical posed to a vocational expert.

### C. Owen's Request for Award of Immediate Payment of Benefits

Owen has requested that the court grant immediate payment of benefits in lieu of remanding his case for further administrative proceedings. It is within the court's discretion to do

so. *Ragland v. Shalala*, 992 F.2d 1056, 1060 (10th Cir. 1993). A court may consider the "length of time the matter has been pending and whether or not given the available evidence, remand for additional fact-finding would serve any useful purpose but would merely delay the receipt of benefits." *Salazar v. Barnhart*, 468 F.3d 615, 626 (10th Cir. 2006) (quotation, alteration, and citation omitted). Yet, even when a dispute over benefits has lasted many years, it is appropriate to remand the dispute if the ALJ is to conduct more fact-finding or make further considerations. *See Tucker v. Barnhart*, No. 05-5118, 2006 WL 2981287, *6 (10th Cir. Oct. 19, 2006) (remanding the case even though the matter had been in dispute for nine years).

The ALJ committed legal error in not explaining which evidence was relied upon or rejected at step three, and remanding the case for further consideration would serve a useful purpose. The court has not determined that Owen meets or fails to meet the criteria of Listing 1.04(a). That is the job of the ALJ, who must discuss the evidence and support the step-three conclusion with substantial evidence.

The ALJ's flawed hypothetical to the vocational expert also does not warrant immediate payment of benefits. The court cannot divine whether including evidence of Owen's manipulative impairments would lead to a conclusion that Owen is incapable of performing work in the national economy. Further, this step-five determination would be relevant only after the ALJ conducted a more detailed analysis at step three and concluded, based on substantial evidence, that Owen did not meet the criteria of Listing 1.04(a). Additionally, the ALJ should be given the chance on remand to accept or reject evidence of Owen's carpal tunnel syndrome.

Although Owen first filed for disability insurance benefits about four years ago and the process for evaluating his impairments may be frustrating, remand is necessary for the ALJ to

correct legal error and make a determination based on substantial evidence and thorough consideration of Owen's medical record.

For the foregoing reasons,

**IT IS ORDERED** that the ALJ's decision is VACATED AND REMANDED to the Commissioner for further proceedings consistent with this Memorandum Opinion & Order.

DATED this 11th day of March, 2009.

BY THE COURT:

BRUCE S. JENKINS
United States Senior District Judge

19